No. 51,405

KENNETH F. STEPHENS and THE WICHITA EAGLE AND BEACON PUB-
LISHING CO., INC., *Plaintiffs,* v. DOROTHY I. VAN ARSDALE, Clerk,
Sedgwick County District Court, *Defendant.*

(608 P.2d 972)

Opinion filed April 5, 1980.

*Gerrit H. Wormhoudt,* of Wichita, argued the cause, and *Donald R. Newkirk,* of Wichita, was with him on the briefs for the plaintiffs.

*Janet A. Chubb,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with her on the brief for the defendant.

*Ward P. Ferguson,* of McPherson, argued and was on the brief *amicus curiae.*

*W. Y. Chalfant,* of Branine, Chalfant, and Hyter, of Hutchinson, was on the brief *amicus curiae* for The Hutchinson Publishing Company, d/b/a The Hutchinson News.

*Michael W. Merriam,* of Colmery, McClure, Funk, Letourneau, and Entz, of Topeka, was on the brief *amicus curiae* for Stauffer Communications, Inc.

The opinion of the court was delivered by

PRAGER, J.: This is an original proceeding in mandamus against Dorothy I. Van Arsdale in her official capacity as Clerk of the District Court of Sedgwick County, Kansas, which arose from her denial to plaintiffs of access to certain court files of criminal proceedings. Access to the court files was denied on the ground that K.S.A. 1979 Supp. 22-4712 and K.S.A. 1979 Supp. 21-4619 prohibited their disclosure to these plaintiffs. In this action, plaintiffs challenge the constitutionality of those statutes. The parties have stipulated to the facts as follows:

"1.   Plaintiff The Wichita Eagle and Beacon Publishing Company, Inc. is a corporation organized and existing under the laws of Kansas. Its principal place of business is 825 East Douglas, Wichita, Kansas. Plaintiff Kenneth F. Stephens is a resident and taxpayer of, and registered to vote in, Sedgwick County, Kansas.

"2.   The Wichita Eagle and Beacon Publishing Company, Inc. publishes and causes to be distributed throughout the state of Kansas morning and evening newspapers of general circulation. . . . Plaintiff Stephens, at all times material, has been employed as a reporter by plaintiff newspaper and has been assigned by it to the Courts' beat.

"3.   Defendant Dorothy I. Van Arsdale is the duly appointed and presently serving Clerk of the District Court of Sedgwick County, Kansas. As such, defendant is the custodian of and charged with the duty of keeping and maintaining the court files in criminal proceedings before the District Court of Sedgwick County, Kansas . . . .

"4.   For many years prior to the enactment and implementation of the statutes referred to in paragraph 3 above, plaintiff newspaper, or its predecessors in interest, acting through employees such as plaintiff Stephens, in the normal course of business regularly gathered, published and sold accounts of criminal proceedings before the District Court of Sedgwick County, Kansas, including reports of arrests, preliminary proceedings, prosecutions, convictions, acquittals and appeals. A source of such published information has been the records of criminal proceedings required to be kept and maintained by defendant and by her predecessors in office. Plaintiff newspaper has regularly gathered and disseminated such information daily, and it has been purchased, directly or indirectly, for nominal consideration by members of the public.

"5.   On account of the practice of gathering and publishing such information, followed as aforesaid by plaintiff newspaper, its subscribers and readers have also been provided with information concerning the course of criminal activity in their community and the administration of criminal justice by public officials elected,

or appointed by those elected, whose duties include the investigation of complaints of criminal conduct, apprehension and prosecution of those charged with crimes, and adjudication of the guilt or innocence of those so charged.

"6. Plaintiff newspaper's subscribers and readers comprise the great majority of the populace and of the electorate of Sedgwick County, Kansas, and such persons are the main source of the funds that make possible all of the activities and functions of the government of Sedgwick County, Kansas . . . .

"7. Defendant has denied plaintiffs access to files and records regularly kept and maintained in her office and subject to her custody and control in these specific instances:

"a) On August 8, 1979 plaintiff Stephens requested permission from one of the defendant's deputies to examine a court file containing the record of proceedings in a criminal prosecution before the District Court of Sedgwick County, Kansas that had resulted in an acquittal of two adult defendants. Permission was denied on the basis of the aforesaid Chapter 95, 1979 Session Laws of Kansas [K.S.A. 1979 Supp. 22-4712]. . . .

"b) On or about August 16, 1979 plaintiff Stephens requested permission of defendant to examine the contents of files in those criminal cases that had been 'expunged' pursuant to orders of the District Court of Sedgwick County, Kansas. The provisions of K.S.A. 1978 Supp. 21-4619, as amended, and orders of the District Court of Sedgwick County made pursuant thereto were given by defendant as justification for denial to plaintiffs and to the public of access to those files."

The statutes whose constitutionality is being challenged are K.S.A. 1979 Supp. 22-4712 and K.S.A. 1979 Supp. 21-4619, which provide in pertinent part as follows:

"22-4712. Disclosure of arrests not resulting in conviction; limitations. (1) Whenever any person has been arrested for the violation of any ordinance of any city, the resolution of any county in this state or any law of this state and the charges have been dismissed or the person has been found not guilty by a court or jury or where the person arrested has been released pursuant to K.S.A. 22-2406, all records of such arrest, including fingerprints and photographs of the person shall be confidential information. Such information shall not be disclosed by any officer or employee of a criminal justice agency, as defined in K.S.A. 1979 Supp. 22-4701, to anyone other than another officer or employee of such a criminal justice agency, a prosecuting attorney or to the person arrested or his or her attorney.

"(2) Except in any application for employment as a detective with a private detective agency, as defined by K.S.A. 75-7b01; as security personnel with a private patrol operator, as defined by K.S.A. 75-7b01; or with a criminal justice agency, as defined by K.S.A. 1979 Supp. 22-4701, any person so arrested may state in any application for employment, license or other civil right or privilege, or any appearance as a witness, that he or she has never been arrested for such violation."

"21-4619. Expungement of certain convictions. (a) Except as provided in subsection (b), any person convicted in this state of a misdemeanor or a class D or E felony may petition the convicting court for the expungement of such convic-

tion if two or more years have elapsed since the person: (1) Satisfied the sentence imposed; or (2) was discharged from probation, parole, conditional release or a suspended sentence.

"(b) In the case of a conviction for a class A, B or C felony or any violation enumerated in subsection (a) of K.S.A. 1979 Supp. 8-285, and any amendments thereto, no person may petition for expungement until five or more years have elapsed since the person: (1) Satisfied the sentence imposed; or (2) was discharged from probation, parole, conditional release or a suspended sentence.

"(c) When a petition for expungement is filed, the court shall set a date for a hearing thereon and shall give notice thereof to the prosecuting attorney. . . . All petitions for expungement shall be docketed in the original criminal action. Any person who may have relevant information about the petitioner may testify at the hearing. The court may inquire into the background of the petitioner and shall have access to any reports or records relating to the petitioner that are on file with the secretary of corrections or the Kansas adult authority.

"(d) At the hearing on the petition, the court shall order the petitioner's conviction expunged if the court finds:

"(1) That the petitioner has not been convicted of a felony in the past two years and no proceeding involving any such crime is presently pending or being instituted against the petitioner;

"(2) that the circumstances and behavior of the petitioner warrant the expungement; and

"(3) that the expungement is consistent with the public welfare.

"(e) When the court has ordered a conviction expunged, the order of expungement shall state the information required to be contained in the petition. The clerk of the court shall send a certified copy of the order of expungement to the federal bureau of investigation, the Kansas bureau of investigation, the secretary of corrections and any other criminal justice agency who may have a record of the conviction. After the order of expungement is entered, the petitioner shall be treated as not having been convicted of the crime, except that:

"(1) Upon conviction for any subsequent crime the conviction that was expunged may be considered as a prior conviction in determining the sentence to be imposed;

"(2) in any application for employment: (A) as a detective with a private detective agency, as defined by K.S.A. 75-7b01; (B) as security personnel with a private patrol operator, as defined by K.S.A. 75-7b01; or (C) with a criminal justice agency, as defined by K.S.A. 1979 Supp. 22-4701, the petitioner, if asked about previous convictions, must disclose that the conviction took place;

"(3) the court, in the order of expungement, may specify other circumstances under which the conviction is to be disclosed; and

"(4) the conviction may be disclosed in a subsequent prosecution for an offense which requires as an element of such offense a prior conviction of the type expunged.

"(f) Whenever a person is convicted of a crime, pleads guilty and pays a fine for a crime or is placed on parole or probation or is given a suspended sentence or conditional release, the person shall be informed of the ability to expunge the conviction.

"(g) Subject to the disclosures required pursuant to subsection (e), in any

application for employment, license or other civil right or privilege, or any appearance as a witness, a person whose conviction of a crime has been expunged under this statute may state that he or she has never been convicted of such crime, but the expungement of a felony conviction does not relieve an individual of complying with any state or federal law relating to the use or possession of firearms by persons convicted of a felony.

"(*h*) Whenever the record of any conviction has been expunged under the provisions of this section or K.S.A. 1977 Supp. 12-4515, 21-4616, 21-4617 or the statutory predecessor of such sections, the custodian of the records of arrest, conviction and incarceration relating to that crime shall not disclose the existence of such records, except when requested by:

"(1) The person whose record was expunged;

"(2) a criminal justice agency, private detective agency or a private patrol operator, and the request is accompanied by a statement that the request is being made in conjunction with an application for employment with such agency or operator by the person whose record has been expunged;

"(3) a court, upon a showing of a subsequent conviction of the person whose record has been expunged;

"(4) a person entitled to such information pursuant to the terms of the expungement order; or

"(5) a prosecuting attorney, and such request is accompanied by a statement that the request is being made in conjunction with a prosecution of an offense that requires a prior conviction as one of the elements of such offense."

Prior to oral arguments herein the parties filed a joint statement of their respective contentions and a joint designation of the issues to be determined which essentially are as follows:

### "CONTENTS OF PLAINTIFFS

"1.  Plaintiffs have standing to bring this action in their own right  . . . .

"2.  The constitutional, common law and statutory guarantees of access to information concerning the conduct of the government and the protection afforded to the dissemination of such information were established and continue to exist in order to secure and give effect to the terms of the constitutional compact enduring between those serving from time to time as public officials and those who appoint and sustain them.

"3.  The denial of access to files and records regularly kept and maintained in the office of the Clerk of the Court, Sedgwick County, Kansas, under the custody and control of said clerk violate the rights of plaintiffs, and of the members of the class they seek to represent, as guaranteed by the Bill of Rights and the Constitution of the State of Kansas and by the First and Fourteenth Amendments of the United States Constitution.

"4.  The legislation relied upon as justification for the denial of access is void because:

"a) It abridges the liberty of the press with respect to the gathering and dissemination of information concerning the administration of criminal justice as such liberty existed at the time of adoption of the Constitution of this State and as it has continued to exist throughout the history of this State, in violation of the guarantee of Section 11 of the Bill of Rights that 'The liberty of the press shall be inviolate';

"b) It further violates the liberty of plaintiffs and of the press generally in that it denies to them the benefits of truth as a defense in civil actions for defamation, contrary to the specific guarantees of Section 11 of the Bill of Rights of this state that 'the truth may be given in evidence to the jury';

"c) Because of such purported legislated restriction upon the proof of truth as a defense in civil proceedings a prior restraint on publications is imposed, and the right of all persons to freely speak, write or publish their sentiments is impaired, notwithstanding the express language of Section 11, Bill of Rights;

"d) By authorizing concealment of information as to the conduct of public officials responsible for the administration of criminal justice, it frustrates the rights of self-governance retained by the people of this State, as stated generally in Section 2, Bill of Rights and specifically the rights reserved in the people to 'consult for their common good' and 'to instruct their representatives,' expressed in Section 3, Bill of Rights, and the rights of suffrage and of election provided for in Articles 4 and 5 of the Constitution.

"e) Such acts of the legislature violate the separate powers constitutionally reserved to the judiciary of this state by purporting to authorize false testimony in the course of judicial proceedings and to deny access to evidence pertinent to such proceedings;

"f) Such legislative interference with judicial trials directly violates the right of trial by jury, protected by Section 5, Bill of Rights, and infringes fundamental due process guarantees expressed in Sections 1, 2 and 18 of the Bill of Rights;

"g) Such acts of the legislature exceed the power to make laws, conferred by Article 1 of the Constitution, since the authority thereby conferred does not include the power to change that which is true to that which is false; and

"h) By purporting to direct by judicial order the erasure from public view of all evidence of convictions of crimes, such legislation infringes powers separately granted to the judiciary under Article 3 and those granted to the executive department under Article 1, Section 7."

## "ISSUES FOR DETERMINATION

"1.  Does mandamus lie to compel the action sought by plaintiffs?

"2.  Do plaintiffs have standing to bring this action  .  .  .?

"3.  Is [K.S.A. 1979 Supp. 22-4712] invalid as an abridgment of rights protected by the Bill of Rights and Constitution of Kansas or by the First and Fourteenth Amendments to the United States Constitution?

"4.  Is [K.S.A. 1979 Supp. 21-4619] invalid as an abridgment of rights protected by the Bill of Rights and Constitution of Kansas or by the First and Fourteenth Amendments of the United States Constitution?

"5.  Should the order of mandamus sought by plaintiffs issue?"

We turn now to consideration and determination of the issues.

I.  Is Mandamus an Appropriate Remedy?

K.S.A. 60-801 provides:

"Mandamus is a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law."

Defendant challenges the propriety of an action in mandamus to compel a public official to perform acts made unlawful by state statutes. In support of this contention defendant directs our attention to some of this court's earlier pronouncements on mandamus as follows: Mandamus will not lie to compel a public officer to perform an unauthorized act. *Johnson County Sports Authority v. Shanahan,* 210 Kan. 253, 499 P.2d 1090 (1972). The remedy of mandamus is available only for the purpose of compelling the performance of a clearly defined duty resulting from the office, trust, or official station of the party to whom the order is directed, or from operation of law. The remedy may not be used to control discretion or to enforce a right which is in substantial dispute. *Armstrong v. City of Salina,* 211 Kan. 333, 507 P.2d 323 (1973). Mandamus will not lie if another adequate remedy at law exists (inferentially gleaned from *Boylan v. Warren, Clerk,* 39 Kan. 301, 307, 18 Pac. 174 [1888]).

On occasion, this court, when confronted with significant issues of statewide concern, has broadened the availability of mandamus in order to expeditiously resolve the issues. In *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, 436 P.2d 982 (1968), this court held:

"Mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact there also exists an adequate remedy at law." Syl. ¶12.

"The use of mandamus to secure a speedy adjudication of questions of law for the guidance of state officers and official boards in the discharge of their duties is common in this state." Syl. ¶13.

"Mandamus is a proceeding designed for the purpose of compelling the performance of a clearly defined duty, not involving the exercise of discretion, by a person or corporation whose duty arises out of a trust relationship, or a public or corporate responsibility." Syl. ¶14.

The use of mandamus to secure a speedy adjudication of questions of law for the guidance of state officers and official boards in the discharge of their duties is common in this state. Our conceptions of the proper use of mandamus to expedite the official business of the state have expanded far beyond the ancient limitations of matters justiciable in mandamus. *State, ex rel., v. State Highway Comm.,* 132 Kan. 327, 334-35, 295 Pac. 986 (1931). Where a public official's action or refusal to act is based upon a statute whose validity is challenged, mandamus may lie in ap-

propriate cases. See *In re Insurance Tax Cases,* 160 Kan. 300, 161 P.2d 726 (1945); *Miller v. Jackson,* 166 Kan. 141, 199 P.2d 513 (1948).

We have no hesitancy in concluding that the issues herein are of significant statewide concern of a recurring and ongoing nature, and the essential purpose of the proceeding is to obtain an expeditious, authoritative interpretation of the law for the guidance of public officials in the administration of the public business, and that mandamus is an appropriate remedy.

II.   Do Plaintiffs have Standing to Maintain this Action?

The plaintiffs contend they have standing to maintain this action both individually and as representatives of all the citizens of Kansas. The general rules relative to the standing of a private citizen to maintain a mandamus action were set forth in *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, Syl. ¶17, where this court stated:

"While mandamus will not ordinarily lie at the instance of a private citizen to compel the performance of a public duty, it has been held where an individual shows an injury or interest specific and peculiar to himself, and not one that he shares with the community in general, the remedy of mandamus and the other extraordinary remedies are available."

Have plaintiffs shown some injury or interest specific and peculiar to themselves and not one that they share with the community in general? We conclude the plaintiffs have shown such injury and interest. They collect and sell news to their customers, the citizens of Kansas. The denial by the defendant to these plaintiffs of access to official court records impairs their ability to carry on their business, the collection and dissemination of information. The plaintiffs have demonstrated that they have the requisite standing to maintain this action individually.

III.   Is K.S.A. 1979 Supp. 22-4712 Invalid as an Abridgment of Rights Protected by the Bill of Rights and Constitution of Kansas or by the First and Fourteenth Amendments to the United States Constitution?

Before proceeding to any constitutional questions, we must initially determine whether K.S.A. 1979 Supp. 22-4712 applies to district court criminal files. Defendant denied plaintiffs access to the court file of two adult codefendants who had been acquitted. The denial was predicated on the belief that K.S.A. 1979 Supp. 22-4712 prohibited her from permitting plaintiffs to examine the

file. Defendant is an officer or employee of a criminal justice agency, as defined by K.S.A. 1979 Supp. 22-4701(*c*)(3), and therefore subject to various provisions of the Criminal History Record Information Act (K.S.A. 1979 Supp. 22-4701 *et seq.*). 22-4712 should be construed as a part of the Criminal History Record Information Act. The question before us is whether district court criminal records are "records of such arrest" as that term is used in 22-4712. If they are not, the statute is inapplicable and the constitutional issues need not be determined.

We must first determine the legislative intent as to what is included within the term "records of such arrest." Words in common usage are to be given their natural and ordinary meaning in arriving at the proper construction of a statute. *Grey v. Schmidt,* 224 Kan. 375, Syl. ¶1, 581 P.2d 1180 (1978). To the average person arrest connotes physical seizure by law enforcement officers as opposed to court proceedings.

The statute makes confidential the "records of such arrest" and includes, specifically, fingerprints, and photographs taken of the person so arrested. Under the rule of "ejusdem generis," the specific words control over general provisions in statutes unless contrary legislative intent clearly appears. *Harris v. Shanahan,* 192 Kan. 629, 390 P.2d 772 (1964). The language used indicates a legislative intent that confidential items should be limited to specific documents concerned primarily with the arrest, such as the officer's report, the arrest warrant, arrest index cards of the agency involved, photographs, fingerprint cards, and "rap sheets." The entire court file would include much more information than an arrest record. Such a broad application conceivably could be stretched to include the appellate court opinions on criminal appeals in which the defendant is released! We doubt that such was the legislative intent.

When we construe K.S.A. 1979 Supp. 22-4712 as a part of the Criminal History Record Information Act (K.S.A. 1979 Supp. 22-4701 *et seq.*), it is clear that the term "records of arrest," as used in 22-4712, does not include court records of public judicial proceedings or published judicial opinions. Under K.S.A. 1979 Supp. 22-4701(*b*)(3), the definition section of the act, the term "criminal history record information" is specifically declared not to include "wanted posters, police blotter entries, *court records of public judicial proceedings, or published court opinions.*" We

also note that K.S.A. 1979 Supp. 22-4704 authorizes the director of the Kansas bureau of investigation to adopt rules and regulations for agencies in the executive branch of government and for criminal justice agencies "other than those that are part of the judicial branch of government." 22-4707 provides for restrictions on dissemination of criminal history record information. Construing all of these statutes together, we have concluded that K.S.A. 1979 Supp. 22-4712 has no application to criminal court records of a district court and hence it imposes no restrictions on the right of the press or any other private citizens to have access to the same. Having so construed the statute, we hold that the constitutional validity of K.S.A. 1979 Supp. 22-4712 is not before the court and need not be determined in this case.

IV.   Is K.S.A. 1979 Supp. 21-4619 Invalid as an Abridgment of Rights Protected by the Bill of Rights and Constitution of Kansas or by the First and Fourteenth Amendments to the United States Constitution?

The provisions of K.S.A. 1979 Supp. 21-4619 are set forth in full at the beginning of the opinion. In challenging the constitutional validity of the statute, the plaintiffs contend, in substance, that the statute violates certain rights guaranteed by the First and Fourteenth Amendments to the United States Constitution and the Kansas Bill of Rights involving freedom of the press and the right of the public to know and have information concerning the conduct of public officials responsible for the administration of criminal justice. At the outset, it should be stated that the question of access of the press to public records has been a subject of a great deal of litigation in recent years. The question of restricting public access to state court records is the subject of a comprehensive annotation at 84 A.L.R.3d 598. In that annotation, the conflicting views on the subject are set forth and many cases are cited expressing those different points of view. It would serve no useful purpose to survey the entire field of this litigation or the various positions taken by the courts. Suffice it to say, most of the basic issues involved in this case have been resolved by recent decisions of the United States Supreme Court and of this court.

Before considering the constitutionality of K.S.A. 1979 Supp. 21-4619, we deem it important to make it clear what this case does not involve. The statute does not attempt to restrain the press in the publication of any information available to or in the hands of

the media or any other person. The statute does not exclude representatives of the press from any trial, nor does it close any trial from public scrutiny. The statute makes no attempt to deny representatives of the press access to the court records in a particular criminal case while that case is in the process of adjudication or prior to a finding of guilty or the imposition of sentence in the case. The statute simply provides that certain criminal records may be expunged only after the expiration of an extended period of time and only after a convicted criminal has petitioned the court and proved to the court that he has been rehabilitated and is entitled to such an expungement. With these observations in mind, we turn to the questions presented for determination.

Under the decisions of the United States Supreme Court and of this court, the right of the press or any other person to access to court records is not a right which falls within the protections afforded by the First and Fourteenth Amendments to the United States Constitution. The right of the public to access to public records for public inspection is based in our common law. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 55 L.Ed. 2d 570, 98 S.Ct. 1306 (1978). This common-law right to inspect public records has been buttressed in many states by statutory codification. In Kansas we have K.S.A. 1979 Supp. 45-201 which provides in pertinent part as follows:

"45-201. **Official public records open to inspection; exceptions; 'official public records' defined.** (*a*) All official public records of the state, counties, municipalities, townships, school districts, commissions, agencies and legislative bodies, which records by law are required to be kept and maintained, except those of the district court concerning proceedings pursuant to the juvenile code which shall be open unless specifically closed by the judge or by law, adoption records, records of the birth of illegitimate children, and records specifically closed by law or by directive authorized by law, shall at all times be open for a personal inspection by any citizen, and those in charge of such records shall not refuse this privilege to any citizen."

Simply stated, that statute requires all official public records to be open unless either closed by the judge or by some statute. The right of access to public records under such statutes has generally been held by the courts to include court records. *Nixon v. Warner Communications, Inc.,* 435 U.S. at 597; *State v. Stauffer Communications, Inc.,* 225 Kan. 540, 592 P.2d 891 (1979). See also the many cases cited in 20 Am. Jur. 2d, Courts §§ 61, 62 at pp.

428-429; and the annotation at 84 A.L.R.3d 598, Public Access to State Courts Records.

The right of access of the public, including the press, to court records is not absolute, as noted by the court in *Nixon:*

"It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. . . .

"[T]he decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." pp. 598-599.

Moreover, the right of public access to court records has never been held a right of constitutional proportions in this state. In *Boylan v. Warren, Clerk,* 39 Kan. 301, the right of access of a citizen to public records in the office of the clerk of the court was held to be statutory. In *Boylan,* mandamus was issued to compel the court clerk to open court records under Section 172, Article 15, Chapter 25 of the Compiled Laws of 1885. Our present open records statute, as noted above, requires official records to be opened for inspection unless specifically closed by the judge or by law. In our recent decision in *State v. Stauffer Communications, Inc.,* 225 Kan. 540, this court recognized the power of the legislature, not only to compel the opening of public records for public inspection, but also to restrict access to official documents. In the opinion, the court stated:

"As a general rule it may be said if the state wants to keep the press from publishing information related to its governmental functions then it must do so by protecting the confidentiality of the information. See *Cox Broadcasting Corp. v. Cohn,* 420 U.S. at 496, Bezanson, *The New Free Press Guarantee,* 63 Virginia L. Rev. 731 (1977). The state is free to do so absent some limiting statute. The Supreme Court has consistently held that '[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.' *Houchins v. KQED, Inc.,* 438 U.S. at 15. See also *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 55 L.Ed. 2d 570, 98 S.Ct. 1306 (1978); *Pell v. Procunier,* 417 U.S. 817, 834, 41 L.Ed. 2d 495, 94 S.Ct. 2800 (1974); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 41 L.Ed. 2d 514, 94 S.Ct. 2811 (1974). The First Amendment is 'neither a Freedom of Information Act nor an Official Secrets Act.' Stewart, *Or of the Press,* 26 Hastings L. J. 631, 636 (1975). (Quoted in *Houchins v. KQED, Inc.,* 438 U.S. at 14.)" p. 545.

See also *Atchison, T. & S.F. Rly. Co. v. Commission on Civil Rights,* 215 Kan. 911, 529 P.2d 666 (1974), where the court holds

that K.S.A. 45-201 does not require all agency documents to be open to public inspection.

Thus, this court, as well as the Supreme Court of the United States, has recognized that court records may be kept from public scrutiny under appropriate circumstances. In *Nixon v. Warner Communications, Inc.,* 435 U.S. at 598, cases are cited holding that the common-law right of public inspection must bow before the power of a court to insure that its records will not be used "to gratify private spite or promote public scandal" through the publication of the details of a divorce case or for the publication of libelous statements for press consumption, or as sources of business information that might harm a litigant's competitive standing. *Nixon* states that the decision as to access to court records is one best left to the sound discretion of the trial court, "a discretion to be exercised in light of the relevant facts and circumstances of the particular case." p. 599.

The court having recognized the legislative and judicial authority to restrict public access to official court records in appropriate circumstances, it becomes necessary to determine whether restricting access to criminal records after a conviction has been expunged is an appropriate exercise of that authority. To determine this issue we must, of course, balance the right of the public to inspect and copy judicial criminal records against the legislative policy to expunge criminal records after the lapse of a considerable period of time and after an appropriate judicial proceeding has been conducted. We recognize, of course, the importance of public access to judicial records. Such a right should not be lightly regarded or restricted for trivial purposes. Our task is to determine whether K.S.A. 1979 Supp. 21-4619 provides a reasonable restriction on public access to certain criminal records which the court should uphold. To do so we must carefully consider the purpose of K.S.A. 1979 Supp. 21-4619 and the degree of restriction which it actually imposes.

In *State v. Miller,* 214 Kan. 538, 520 P.2d 1248 (1974), this court considered the underlying purpose of statutes providing for the annulment and expungement of criminal convictions such as was provided for in K.S.A. 1972 Supp. 21-4616. That statute, enacted in 1971, applied only to youthful offenders who had not yet attained the age of twenty-one years at the time of the commission of the crime. In 1973, the legislature enacted K.S.A.

1973 Supp. 21-4617 which made possible the expungement of records of adult offenders who were twenty-one years of age or older at the time of the commission of the crime. In 1978, the legislature enacted the present statute, K.S.A. 1979 Supp. 21-4619, which is now before the court for consideration. In *Miller,* the opinion discusses in depth the policy behind the 1971 statute using the following language:

"Over the past 50 years American correctional law, turning away from the vengeance concept, has focused increasingly on the rehabilitation of the individual offender and the development of means and practices appropriate to that end. It has become common knowledge today that a criminal record is a serious handicap which works against the rehabilitation of the ex-offender. The consequences of a criminal conviction include not only the formal penalties and restrictions imposed by law but also collateral sanctions incidentally imposed by society. Although the criminal offender has paid his debt imposed by law, society stigmatizes him with the ex-convict label. In *United States v. Morgan,* 346 U.S. 502, 98 L.Ed. 248, 74 S.Ct. 247, the Supreme Court of the United States pointed this out in the following language:

" '. . . Of course the record of a conviction for a serious crime is often a lifelong handicap. There are a dozen ways in which even a person who has reformed, never offended again, and constantly endeavored to lead an upright life may be prejudiced thereby. The stain on his reputation may at any time threaten his social standing or affect his job opportunities . . . .' (p. 519.)

"One author describes the problem in this manner:

" 'It is not the explicitly articulated disabilities which are most troublesome to the reformed offender. It is rather the less-direct economic and social reprisals engendered by his brand as an adjudicated criminal. The vagaries of public sentiment often discriminate against persons with a criminal past, with very little regard for the severity of the offense, and they do not frequently distinguish between persons arrested and acquitted or otherwise released and persons convicted. This is particularly true in the vital matter of employment, which perhaps as much as anything else influences a man's concept of himself and his worth, and accordingly influences the values which guide his conduct.' (Gough, *The Expungement of Adjudication Records of Juvenile and Adult Offenders: A Problem of Status,* 1966 Wash. U.L.Q. 147 at 153.)

"For over a decade the National Council on Crime and Delinquency has urged the passage of legislation to authorize the trial courts of this country to annul a record of conviction, thus facilitating the return to normal living of an offender. The National Council drafted a model act to achieve this purpose which may be found along with a discussion of the problem in 8 Crime and Delinquency 97.

"More recently the American Bar Association Standards for Criminal Justice have recognized the necessity for such legislation. Standards for Criminal Justice relating to Probation § 4.3 provides as follows:

" '4.3 Criminal record. Every jurisdiction should have a method by which the collateral effects of a criminal record can be avoided or mitigated following the successful completion of a term on probation and during its service.'

The advisory committee which drafted this standard stated that it was not as concerned with the form which such statutes take as it is with the principle that flexibility should be built into the system and that effective ways should be devised to mitigate the scarlet letter effect of a conviction once the offender has satisfactorily adjusted. Several states including Alaska, Arizona, California, Delaware, Idaho, Indiana, Michigan, Minnesota, Missouri, New Jersey, Texas, Utah, Washington, and Wyoming have already enacted progressive legislation aimed at the expungement of criminal records and annulment of related convictions. These statutes take a wide variety of forms but all are directed to the basic purpose of assisting an ex-offender to overcome the stigma of a criminal record. A procedure for setting aside a conviction is also provided in the Federal Youth Corrections Act, 18 U.S.C.A. § 5021. In *Mestre Morera v. United States Immigration & Nat. Serv.*, (1st Cir. 1972) 462 F.2d 1030, it is stated that the purpose of that federal statute is to relieve the youthful offender not only of the usual disabilities of a criminal conviction, but also to give him a second chance free of a record tainted by such a conviction.

"In a general way it may be stated that annulment of conviction statutes, often called expungement statutes, do not merely lift disabilities resulting from conviction and restore civil rights; they have the legal effect of restoring the reformed offender to his status quo existing prior to the conviction. We think it clear that K.S.A. 1972 Supp. 21-4616 was enacted to relieve youthful offenders from the social and economic stigma resulting from criminal convictions and to offer them an added incentive to conform to social norms and to participate in our society without the added burden of a criminal conviction. An annulment of conviction statute is an aid to an ex-offender in regaining his human dignity and self-esteem. It is a legislative recognition of the fact that ex-offenders need the understanding and respect of others—not their scorn and ill will. Such statutes are based on the philosophy that fallen men can rise again and should be helped to do so." pp. 542-544.

In *Miller,* we pointed out that the provisions of K.S.A. 1972 Supp. 21-4616 were permissive rather than mandatory and that a great amount of discretion was vested in the trial court in granting a defendant an annulment of his conviction. We held that the statute simply provided to the district courts of this state an additional tool to be used in the sound discretion of the court as an aid to the rehabilitation of offenders. The granting of an application for the annulment of convictions was a part of the sentencing process and, hence, a judicial function. The 1978 statute, now before us, may be distinguished from the 1971 statute in that it provides for the expungement of a conviction rather than the annulment of a conviction. Although the approach taken by the legislature to help in the rehabilitation of an offender is not exactly the same, the statutes essentially have the same purposes—the convicted criminal is provided with an incentive for rehabilitation by providing him an avenue by which he may

later deny the conviction and again seek gainful employment without the added burden of a criminal conviction.

The Kansas statute providing for the expungement of a criminal conviction is not unique to this state. Other jurisdictions have, likewise, enacted expungement statutes as a legislative tool for criminal rehabilitation, apparently without constitutional challenge on First Amendment grounds. The individual statutes vary rather substantially in their terms but all are directed toward the same end. States which have enacted types of annulment and expungement of conviction statutes include:

Alaska, Alaska Stat. § 12.62.040 (1972).

Arkansas (first offender), Ark. Stat. Ann. §§ 43-1231, 43-1235 (1977).

California, Cal. Penal Code 1980 Supp. §§ 1203.4, 1203.4a (West).

Connecticut, Conn. Gen. Stat. § 54-76p (1979).

Georgia, Ga. Code Ann. 1979 Supp. § 27-2728.

Idaho, Idaho Code § 19-2604 (1979).

Illinois, Ill. Ann. Stat. 1979 Supp. ch. 38 § 1005-6-3.1 (Smith-Hurd).

Iowa, Iowa Code Ann. § 907.9 (West 1979).

Maryland, Md. Ann. Code 1979 Supp. art. 27 § 737.

Massachusetts, Mass. Ann. Laws 1979 Supp. ch. 276 § 100A (Michie/Law. Co-op).

Minnesota, Minn. Stat. Ann. 1980 Supp. § 364.04 (West).

Nebraska, Neb. Rev. Stat. § 29-2264 (1975).

Nevada, Nev. Rev. Stat. § 179.245 (1973).

New Jersey, N.J. Stat. Ann. 1979 Supp. § 2A:164-28 (West).

Ohio, Ohio Rev. Code Ann. 1979 Supp. § 2953.32 (Page).

Oregon, Or. Rev. Stat. § 137.225 (1979).

Pennsylvania, Pa. R. Crim. Proc. Rules 175-185 (1979).

South Carolina, S.C. Code 1979 Supp. § 34-11-90(e).

Utah, Utah Code Ann. § 77-35-17.5 (1978).

In considering the reasonableness of 21-4619 as a restriction on public access to criminal court records, we must consider the practical effect of the statutory provisions. It should be noted that 21-4619 restricts disclosure of records of a criminal conviction only after the conviction is ordered expunged in a *judicial proceeding.* Under section (*a*), in cases involving misdemeanors or

class D or E felonies, the offender may petition the convicting court for the expungement of his conviction only if two or more years have elapsed since he either satisfied the sentence imposed or was discharged after a period of parole and probation. Under section (b), in cases involving the more serious class A, B, or C felonies, no person may petition for expungement until five years or more have elapsed since the person satisfied the sentence or was discharged after a period of probation or parole. It is difficult to see how such statutory restrictions deny the press any meaningful access to judicial proceedings or records. The public or press are free to attend the original trial or the sentencing hearing or any post-judgment hearings or the expungement proceeding itself. Section (c) provides that any person who might have relevant information about the petitioner may testify at the hearing. This affords the victim of the crime a full opportunity to be present and oppose the expungement if he so desires. If the press desires to send one of its representatives to the expungement hearing, it is free to do so.

As to the public's right to observe and evaluate judicial performance, it would seem reasonable to say that any misconduct of the trial judge in allowing an expungement in a particular case could be more accurately observed and evaluated at the expungement hearing itself rather than by laboriously pouring through the records of past cases. It again must be emphasized that the records of the conviction are fully available to the press and to the public at the time the case is filed, during all pretrial proceedings, during the trial itself, at the time sentence is imposed, during post-judgment proceedings, and, in cases of the more serious felonies involving violence, for a minimum period of five years after the offender has served his sentence or satisfactorily completed his period of probation. During all that time, the press can carry out its important function of providing the public with information which may increase a citizen's knowledge about criminal activity and prosecutorial and judicial effectiveness or lack thereof. The records are closed by expungement only after the file has become as newsworthy as cold mashed potatoes.

It cannot be denied that the rehabilitation of criminals is a legitimate concern of the State. The legislature must be allowed a broad discretion in enacting legislation to achieve that end. We

have held on many occasions that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and that, before the statute may be stricken down, it must clearly appear the statute violates the constitution. *State ex rel. Schneider v. Kennedy,* 225 Kan. 13, 20, 587 P.2d 844 (1978); *Leek v. Theis,* 217 Kan. 784, 539 P.2d 304 (1975). In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *Leek v. Theis,* 217 Kan. at 792. Statutes are not to be stricken down unless the infringement of the superior law is clear beyond substantial doubt. *State ex rel. Schneider v. Kennedy,* 225 Kan. at 20. In this case, as there exists no absolute right of access to court records, the statute must be presumed constitutional. After balancing the public's conditional right of access to court records on the one hand and the provisions of K.S.A. 1979 Supp. 21-4619 on the other, we have concluded that the restriction on public access to court records imposed thereby is reasonable and serves a valid and legitimate public purpose. We, therefore, hold that K.S.A. 1979 Supp. 21-4619 is not unconstitutional as a violation of the First or Fourteenth Amendments to the United States Constitution or of Section 11 of the Kansas Bill of Rights.

Plaintiffs contend that the statute has the effect of denying to them the right to assert truth as a defense in actions for libel and slander contrary to Section 11 of the Kansas Bill of Rights. As noted above, of necessity a minimum period of more than two years must expire after the date of conviction before a petition may be filed for expungement, even in cases involving the most minor crimes. For the more serious crimes, a minimum period of five years must expire. Under K.S.A. 60-514, an action for libel or slander must be brought within one year after the cause of action accrues. A cause of action for libel or slander accrues upon publication of the defamatory statement. *Vaughan v. Hornaman,* 195 Kan. 291, 298, 403 P.2d 948 (1965). Furthermore, we must recognize the inherent power which courts have over their official records. In an unusual case, where a former offender is directly involved in civil litigation, a district court might in its discretion permit the release of certain documents contained in an expunged file in order to achieve the ends of justice. That situation, of course, is not involved in this case.

Furthermore, we find no violation of the separation of powers doctrine in this legislation. We held in *State v. Miller*, 214 Kan. 538, that the granting or denial of an application for an annulment of a conviction is a judicial function requiring the exercise of judicial discretion. The statutory procedure for expungement of a criminal conviction likewise requires the exercise of judicial discretion. We find no sound basis for the contention that the power granted to the courts to expunge criminal records interferes with the pardoning power of the chief executive under Article 1, Section 7, of the Kansas Constitution. We find no usurpation of executive power by the judiciary. The executive power to pardon is not the same as the limited power of a court to expunge a conviction as authorized by K.S.A. 1979 Supp. 21-4619. We have, likewise, considered the other contentions advanced by the defendants and find them to be without merit.

In view of the conclusions reached by the court, the defendant, Dorothy I. Van Arsdale, Clerk of the Sedgwick County District Court, is directed to permit the plaintiffs to inspect the district court records to which access has been denied under the authority of K.S.A. 1979 Supp. 22-4712. As to those criminal records which have been expunged under the provisions of K.S.A. 1979 Supp. 21-4619, the defendant is directed to deny access to plaintiffs in accordance with the provisions of that statute. We are certain that the defendant, as Clerk of the District Court of Sedgwick County, will comply with the judgment of this court without the necessity of the issuance of a formal writ of mandamus. Should the issuance of such a writ become necessary at some time in the future, one may be obtained on application of the plaintiffs to this court.

Judgment is, therefore, entered in favor of the plaintiffs in accordance with the foregoing opinion.

McFARLAND, J., dissenting in part and concurring in part: I concur with the majority opinion except as it relates to upholding the validity of the expungement statute (K.S.A. 1979 Supp. 21-4619). From that portion of the majority opinion I respectfully dissent.

I believe K.S.A. 1979 Supp. 21-4619 is an unreasonable restriction on public access to criminal court records. In our modern society the public relies increasingly on the press to keep it

informed on what is transpiring in the courts. In Sedgwick County there are twenty-two judges of the district court. The press obviously cannot be in all court divisions at the same time checking on the administration of justice. The records of judicial proceedings under such circumstances take on even greater significance in the news-gathering process. Open court not only benefits particular parties to particular litigation, but it also helps to keep the administration of justice "honest." As was stated in *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 559-60, 49 L.Ed. 2d 683, 96 S.Ct. 2791 (1976), the United States Supreme Court, citing *Sheppard v. Maxwell,* 384 U.S. 333, 350, 16 L.Ed. 2d 600, 86 S.Ct. 1507 (1966), observed:

" 'A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.' "

The majority states "[t]he records are closed by expungement only after the file has become as newsworthy as cold mashed potatoes." I do not agree. An electorate must be informed on the performance of its elected officials in order to vote intelligently. Let us suppose an incumbent judge is challenged on his granting of expungements. The allegation is made that many of his expungements were improvidently granted or a charge of graft in their procurement is made. The public has a definite legitimate interest in the judge's "track record." Under the statute herein there is no procedure by which the press can check the facts—the press can scrutinize subsequent expungement proceedings but the records as to previous expungements are closed. Additionally, closure of the records precludes any meaningful study or analysis of how expungement is being utilized, and its effects.

Although arising from factually distinguishable circumstances, the following statement from *Welch v. United States,* 371 F.2d 287 (10th Cir.), *cert. denied* 385 U.S. 957 (1966), is significant:

"Fairness in the administration of justice is not a one-way street to be approached only through an entrance limited to the accused. His cause cannot be submitted to automated jurors existing in complete sterility. And prominence of position deserves no special consideration. To the contrary, the administration of justice requires that the personal and professional conduct of any judge be a subject for public concern and knowledge, continued scrutiny, and, in proper

instances, authoritative action. News media not only have a right to report upon the subject, Estes v. State of Texas, 381 U.S. 532, 541, 85 S.Ct. 1628, 14 L.Ed. 2d 543, rehearing denied, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed. 2d 118, but have a professional duty to do so that extends beyond the term newsworthy." p. 291.

There is an old adage that "doctors bury their mistakes, but judges publish theirs." Under this statute, judges may bury some of their mistakes. No matter how much recidivism a judge may have among his "expungees," his past errors in judgment are buried from the public except as such may be gleaned from human recall, old news stories, and other unofficial and frequently inaccurate sources.

In my opinion the public's right to be informed on the operation of its courts of criminal justice is being unreasonably restricted by K.S.A. 1979 Supp. 21-4619.